IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOHN C. DOLBOW, III, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 10-353-SLR |
| | ) |
| MICHAEL ASTRUE, Commissioner, | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

Gary Linarducci, Esquire of Linarducci & Butler PA, New Castle, Delaware. Counsel for Plaintiff.

Charles M. Oberly III, Esquire, United States Attorney, District of Delaware, and Dina White Griffin, Esquire, Special Assistant United States Attorney, District of Delaware, Counsel for Defendant. Of Counsel: Eric P. Kressman, Esquire, Regional Chief Counsel, and Stephen M. Ball, Esquire, Assistant Regional Counsel of the Office of General Counsel, Philadelphia, Pennsylvania.

**MEMORANDUM OPINION**

Dated: July __, 2011
Wilmington, Delaware

[signature] ROBINSON, District Judge

## I. INTRODUCTION

John C. Dolbow, III ("plaintiff") appeals from a decision of Michael J. Astrue, the Commissioner of Social Security ("defendant"), denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Plaintiff has filed a motion for summary judgment asking the court to award him DIB benefits or, alternatively, remand the case for further proceedings. (D.I. 7) Defendant has filed a cross-motion for summary judgment, requesting the court to affirm his decision and enter judgment in his favor. (D.I. 9) The court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).[1]

## II. BACKGROUND

### A. Procedural History

Plaintiff applied for DIB on June 21, 2006 alleging disability since April 19, 2005 due to injuries sustained in a car accident. (D.I. 5 at 86-91) Plaintiff was 21 years old on the onset date of his alleged disability and was 22 at the time his application for benefits was filed. (*Id.* at 139) His initial application was denied on December 13, 2006 and upon his request for reconsideration on November 29, 2007. (*Id.* at 59, 82)

---

[1] Under § 405(g),

> [a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides . . . .

42 U.S.C. § 405(g).

Plaintiff requested a hearing, which took place before an administrative law judge ("ALJ") on March 16, 2009. (*Id.* at 27) After receiving testimony from plaintiff, plaintiff's father, and a vocational expert ("VE"), the ALJ decided on June 29, 2009 that plaintiff is not disabled within the meaning of the Social Security Act, specifically, that plaintiff suffered a closed period of disability from April 19, 2005 through November 2, 2007, but can now perform work that exists in the national economy. (*Id.* at 28) Plaintiff's subsequent request for review by the Appeals Council was denied. (*Id.* at 1) On April 27, 2010, plaintiff brought the current action for review of the final decision denying him DIB. (D.I. 1)

### B. Plaintiff's Non-Medical History

Plaintiff is currently 27 years old. He completed night school through the 9th grade which was the equivalent of an 11th grade education. (D.I. 5 at 31-32) His past relevant work consists of serving as a customer service representative for a credit card company, and a restaurant manager. (*Id.* at 144) This work was characterized as "light and skilled" by the VE. (*Id.* at 48) Plaintiff has not worked since 2005. (*Id.* at 33)

### C. Medical Evidence

#### 1. Physical impairments

Plaintiff was treated at Christianna Hospital for a week in 2005 as a result of a single vehicle auto accident. (*Id.* at 161-242) He suffered numerous injuries, including fracture of both his neck and spine, and damage to his coccyx. (*Id.* at 33) During his initial hospital stay, surgeons performed two spinal fusions, C4 to C6 and L1 to T11. (*Id.* at 34)

2

In May of 2005, after leaving the hospital, plaintiff followed up with J. Rush Fisher, M.D. ("Fisher") who is a specialist in spinal injuries. (*Id.* at 247.) Plaintiff reported that he was doing a bit better since the surgery. (*Id.* at 243) He reported that he suffers from fatigue throughout the day, but that his pain is lessening. (*Id.*) Plaintiff's pain was a 5/10, and he felt "horrible." (*Id.* at 264, 258) Plaintiff had started physical therapy, and Fisher reported that his motor examination is 5/5 throughout. (*Id.* at 247) Fisher recommended that plaintiff discontinue Neurotin, as well as his narcotics as they may have contributed to his fatigue. (*Id.* at 243)

Plaintiff sought medical treatment at Mid-Atlantic Spine on January 16, 2006 complaining of back and neck pain that lasted "all day." (*Id.* at 268) An EMG showed S1 motor radiculopathy with bilateral L5 motor radiculopathy. (*Id.* at 326) In order to treat his pain, plaintiff underwent a series of lumbar epidural injections in February and March 2006. (*Id.* at 310, 323) Despite these injections, his pain levels continued to range from 4/10 to 9/10, and he reported that his pain was "getting worse." (*Id.* at 304, 261) Despite additional nerve blocks in April and August 2006, plaintiff's reported pain remained the same. (*Id.* at 274-78, 295-301, 356)

On April 11, 2007, Dr. Frank Falco, M.D. ("Falco"), diagnosed plaintiff with coccydynia from an x-ray taken that same day. (*Id.* at 372) On June 20, 2007 plaintiff's pain was reported to be 9/10 without medication and 5/10 with. (*Id.* at 369) Despite this pain, Falco noted that plaintiff was alert and oriented, with facial movement and strength that was symmetrical normal. (*Id.* at 370) He had normal bilateral shoulder shrug strength, as well as normal light touch sensation, finger to nose and heel to shin

coordination, hearing, touch sensation, deep tendon reflex, recent and remote memory, and awareness of current events. (*Id.*) Plaintiff could concentrate well, was not easily distracted, and his speech was smooth and clear. (*Id.*) His condition was described as "the same" on October 1, 2007 (*id.* at 363), and again on October 29, 2007. (*Id.* at 463)

Plaintiff was examined by Dr. Muhammed Niaz, M.D. ("Niaz") on November 20, 2007. (*Id.* at 373) Niaz observed that plaintiff had some movement pain (mostly on the right side) during the straight leg test which limited his ability to raise both lower extremities. (*Id.* at 374-75) Plaintiff had no atrophy of muscles and was fully able to bear weight. (*Id.* at 375) There were no noted neurologic abnormalities of sensory, motor or reflexes. (*Id.*) Although he was able to walk without limping, he had poor balance and he was unable to walk in a straight line or on his heels or toes. (*Id.*) Niaz opined that plaintiff had difficulty sitting, standing and walking because of lower back pain, but he could not say how long plaintiff could sit or stand because they are subjective findings. (*Id.*)

Falco continued to treat plaintiff for his pain with no reported change in his condition through June 2008,[2] and performed an impar ganglion block on June 6, 2008. (*Id.* at 435, 437, 440, 459) On July 17, 2008, Falco opined that plaintiff was "totally and permanently disabled from all forms of work."[3] (*Id.* at 387) Plaintiff claimed his coccyx pain worsened during a follow-up on August 11, 2008, and an impar ganglion ablation

---

[2] On November 28, 2008, Falco reported that "[plaintiff's] pain medications are providing adequate pain control without any side effects or complications." (D.I. 5 at 461)

[3] At this point, plaintiff was taking methadone, Roxicodone, Flexeril and Klonopin for his pain. (D.I. 5 at 387)

4

was performed to treat the pain a few weeks later. (*Id.* at 427, 425) Plaintiff suffered a series of falls in November 2008, but an X-Ray performed by Falco revealed no "significant findings." (*Id.* at 407) On March 4, 2009, a CT scan of the lumber spine revealed degenerative disc disease with diffuse disc bulge and disc protrusions at the scanned levels from L3-L4 to L5-S1. (*Id.* at 456)

### 2. Mental health

On October 1, 2007, plaintiff reported "extreme anxiety" and "severe panic attacks" to Falco, his pain management doctor. (D.I. 5 at 363) Plaintiff continued to be woken up by these panic attacks through November of 2007; however, he never visited a psychologist due to a claimed lack of transportation. (*Id.* at 461) As of January 30, 2008, he was still suffering from panic attacks, and severe insomnia which prescription sleep aids did not help. (*Id.* at 449) Despite these statements of panic attacks and insomnia, at each visit, Falco reported that plaintiff was alert and oriented, with his recent and remote memory intact. (*Id.* at 450, 462) Plaintiff concentrated well, was not easily distracted, and his speech was smooth and clear. (*Id.*)

### D. Hearing Before the ALJ

### 1. Plaintiff's testimony

Plaintiff lives on his own. He is 6'4" and weighs 225 pounds. (D.I. 5. at 32) During the hearing, the plaintiff became nauseous from his medications. (*Id.* at 37-38, 57-58) Plaintiff has a highly erratic sleep schedule. (*Id.* at 42) Some days he gets a few hours of sleep, and sometimes he cannot sleep for days. (*Id.* at 42-43) Plaintiff usually relies on others to drive him to and from doctors' appointments, church, and the

grocery store. (*Id.* at 43) While at the grocery store, he can only complete around half the list, and must then go home and rest for the remainder of the day. (*Id.* at 44-45) That said, plaintiff owns his own car, has a driver's license, and drives himself places at times. (*Id.* at 43) His family does most of this housework, and he only cooks by heating up microwave dinners. (*Id.* at 44) He can only walk about a quarter of the way around the block before getting so sore that he must head back and lay down for the rest of the day. (*Id.* at 46)

Plaintiff testified that, because of the pain medications, it is very hard for him to concentrate, and he gets confused often. (*Id.* at 46) He will start reading a book and, when one chapter references something from an earlier chapter, he will not remember the context. (*Id.*) He attends church but it is difficult for him to forecast how he will feel. (*Id.* at 45) One of the hardest things for him to do is to sit and stand. (*Id.*) The pain gets so bad that he sweats, has difficulty concentrating and will throw up on occasion. (*Id.*)

### 2. Testimony of plaintiff's witness

Plaintiff's father testified that plaintiff has problems standing, sitting, and being able to concentrate on any one activity for more than 45 minutes. (*Id.* at 51) Plaintiff's father usually takes plaintiff for his various doctors' appointments and to go shopping at the grocery store. (*Id.*)

Plaintiff's father did not continue to testify because the ALJ informed him that the plaintiff had already testified to the above, and she had no reason to doubt plaintiff's testimony. (*Id.*) Plaintiff's attorney was asked if he had any specific questions for

6

plaintiff's father and, after indicating that he did not, plaintiff's father was dismissed. (*Id.*)

### 3. Vocational expert testimony

The vocational expert was asked to describe plaintiff's prior relevant work experience. According to the file, plaintiff was an assistant manager for a restaurant which is considered light skilled labor with an SVP of six. (*Id.* at 48) Prior to being employed as an assistant manger, plaintiff was a customer service representative for a credit card company. (*Id.*) It was also considered light skilled labor with an SVP of 6. (*Id.*)

> The hypothetical question that was asked by the ALJ was as follows:
>
> [C]onsider a hypothetical individual who is 25-years-old, a gentleman with a limited education who has the ability to read, write and use numbers and has the past work history you described who has the following restrictions. Able to lift and carry first of all 20 pounds occasionally, 10 pounds frequently, who can stand and walk in excess of two hours but less than six hours a day, can sit six hours a day, would need a sit/stand option. Could – can occasionally stoop, crouch, crawl, squat, kneel and balance, can occasionally climb stairs and ladders and scaffolds, no dangerous heights, no dangerous machinery. Should not be exposed to vibrations in the work force, no work place rather, and I would say avoid concentrated exposure also to extreme cold. Able to understand, remember, and carry out detailed instructions adequately and can concentrate and persist adequately at that level of complexity. Has – can sustain a 40-hour work week, eight hour day, five days a week. Has some difficulty with it because of symptoms, primarily pain and fatigue but with effort can do it.

(*Id.* at 53) Based on this hypothetical, the VE testified that plaintiff could perform a limited number of light, unskilled jobs, such as a "office helper" or "pre-assembler for printed circuit boards." (*Id.* at 54) The VE stated that each of these jobs would allow plaintiff to sit and stand as per the ALJ's requirements. (*Id.*) However, the VE admitted

7

that the Dictionary of Occupational Titles does not specifically address a sit/stand option, but that she was indicating that a sit/stand option would be available based upon her work experience placing people with similar disabilities in these jobs. (*Id.*)

The ALJ further modified her hypothetical, attributing more limitations on plaintiff's abilities:

> Now I want to ask you please, ma'am, also at sedentary lifting no more than 10 pounds, standing and walking no more than two hours in a given workday. Sitting [for] a remainder of six, with, with a sit/stand option. Same, same description of mental limitations, can understand, remember and carry out detailed instructions, problems with the workday but because of pain and fatigue, can adhere to a regular work schedule full time and can concentrate and persist adequately at the level [of] detailed instructions.

(*Id.* at 55)

Based on this hypothetical, the VE testified that there were a number of sedentary jobs that meet these requirements, including "order clerk for food and beverage[s]" and "taper for printed circuit boards." (*Id.* at 55)

When asked what would happen if the ALJ assigned credibility to plaintiff's every claim of pain and fatigue resulting in a productivity decrease of 15%, the VE testified that there would be no full-time jobs suitable for plaintiff because any activity would result in him spending the rest of the day in bed. (*Id.* at 55-56)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive, if they are supported by substantial evidence. Accordingly, judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In

making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. *See id.* at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. The inquiry performed is the threshold inquiry of determining whether there is the need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986) (internal citations omitted). Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is

evidence substantial if it is overwhelmed by other evidence–particularly certain types of evidence (e.g., that offered by treating physicians)–or if it really constitutes not evidence but mere conclusion." See Brewster v. Heckler, 786 F.2d 581, 584 (3d Cir. 1986) (quoting Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." Matullo v. Bowen, 926 F.2d 240, 245 (3d Cir. 1990).

In closed period cases, the ALJ must review the record under the "medical improvement" framework. Chrupcala v. Heckler, 829 F.2d 1269, 1274 (3d Cir. 1987); Fifer v. Astrue, Civ. No. 08-372, 2008 WL 4922114, at *3 n.3 (E.D. Pa. Nov. 10, 2008). As the Third Circuit has articulated, "[f]airness would certainly seem to require an adequate showing of medical improvement whenever an ALJ determines that disability should be limited to a specific period." Chrupcala, 829 F.2d at 1274. The medical improvement standard is codified 20 C.F.R. § 404.1594(f). Fifer, 2008 WL 4922114, at *3 n.3.

## IV. DISCUSSION

### A. Regulatory Framework

Social Security Administration regulations incorporate a sequential evaluation process for determining whether a claimant is under a disability. 20 C.F.R. § 404.1520. The ALJ first considers whether the claimant is currently engaged in substantial gainful activity. If he is not, then the ALJ considers in the second step whether the claimant

has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1 (1999), which result in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a listed impairment, then the ALJ assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform his past work. If the claimant cannot perform his past work, then step five is to determine whether there is other work in the national economy that the claimant can perform. *Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000) (citing 20 C.F.R. § 404.1520). If the ALJ finds that a claimant is disabled or not disabled at any point in the sequence, review does not proceed to the next step. 20 C.F.R. § 404.1520(a). It is within the ALJ's sole discretion to determine whether an individual is disabled or "unable to work" under the statutory definition. 20 C.F.R. § 404.1527(e)(1).

If the claimant is found disabled at any point in the process, the ALJ must also determine if his disability continues through the date of decision, i.e., if the disability is limited to a "closed period." In making this determination, the ALJ must follow an eight-step evaluation process codified in 20 C.F.R. § 404.1594. If the ALJ can make a decision at a step, the evaluation will not go on to the next step.

At the first step, the ALJ must determine if the claimant is engaging in substantial gainful activity. If not, the ALJ must determine if the claimant has an impairment or combination of impairments that meets or medically equals the criteria of an impairment

11

listed in 20 C.F.R. §§1520(d), 404.1525 and 404.1526. If the claimant does, his disability automatically continues. At step three the ALJ must determine whether the medical improvement has occurred. Medical improvement is defined as any decrease in medical severity of the impairments as established by improvement in symptoms, signs and/or laboratory findings. 20 C.F.R. §1594(b)(1). If medical improvement has occurred, the ALJ must determine at step four of the medical improvement is related to the ability to work. It is related to the ability to work if it results in an increase in the claimant's capacity to perform basic work activities. 20 C.F.R. §1594(b)(3). If the improvement is related to work, the ALJ must determine at step six if the combination of claimant's conditions are severe. If they are, i.e., they significantly limit the claimant's ability to do basic work activities, the analysis moves to step seven. At step seven the ALJ must assess the claimant's residual functional capacity based on his current impairments and determine if he can perform past relevant work. If he cannot, the analysis moves to the final step wherein the ALJ determines whether other work exists that the claimant can perform given his residual functional capacity and considering his age, education, and past work experience. If such work exists, claimant is no longer disabled.

    The ALJ is required to evaluate all of the medical findings and other evidence that supports a physician's statement that an individual is disabled. The opinion of a treating or primary physician is generally given controlling weight when evaluating the nature and severity of an individual's impairments. However, no special significance is given to the source of an opinion on other issues which are reserved to the ALJ, such as the ultimate determination of disablement. 20 C.F.R. §§ 404.1527(e)(2) &

12

404.1527(e)(3). The ALJ has the discretion to weigh any conflicting evidence in the case record and make a determination. 20 C.F.R. §§ 404.1527(c)(2).

## B. The ALJ's Decision

The ALJ considered the medical evidence of record and testimony received at the hearing, and concluded that plaintiff suffered a closed period of disability from April 19, 2005 until November 2, 2007, but now has the capacity for work and is not disabled as defined by the Social Security Act. The ALJ made the following enumerated findings.

> 1. The claimant met the insured status requirements of the Social Security Act as of April 19, 2005, the date the claimant became disabled.
>
> 2. The claimant has not engaged in substantial gainful activity since April 19, 2005, the alleged onset date (20 C.F.R. § 404.1571 *et seq.*).
>
> 3. The claimant has the following severe impairments: degenerative disc disease of the lumbar, cervical and thoratic spine status post thoracic and cervical fusions and coccydynia (20 C.F.R. § 404.1521 *et seq.*).
>
> 4. From April 19, 2005 through November 1, 2007, the period during which the claimant was disabled, the claimant did not have an impairment or combination of impairments that meet or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525, 404.1526).
>
> 5. After careful consideration of the entire record, the undersigned finds that, from April 19, 2005 through November 1, 2007, the claimant had the residual functional capacity [(RFC)] to perform sedentary work as defined in 20 CFR 404.1567(a) except he could stand and walk in excess of 2 hours a day but less than 6 hours a day; could sit for 6 hours a day; would require a sit/stand option; could occasionally stoop, crouch, crawl, squat, kneel, balance and climb stairs; could never climb ladders and scaffolds; would need to avoid dangerous heights and machinery; would need to avoid vibrations in the workplace; would need to avoid concentrated exposure to extreme cold and due to pain and fatigue, would be severely limited in his ability to perform work at a consistent pace in terms of productivity.
>
> 6. From April 19, 2005 through November 1, 2007, the claimant was unable

to perform past relevant work (20 C.F.R. § 404.1565).

7. The claimant was born on November 25, 1983 and was 21 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 C.F.R. § 404.1563).

8. The claimant has a limited education and is able to communicate in English (20 C.F.R. §§ 404.1564).

9. The claimant's acquired job skills do not transfer to other occupations within the residual functional capacity assessed for the period from April 19, 2005 through November 1, 2007 (20 C.F.R. § 404.1568).

10. From April 19, 2005 through November 1, 2007, considering the claimant's age, education, work experience and residual functional capacity, there were no jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. §§ 404.1560(c) and 404.1569a).

11. The claimant was under a disability, as defined in the Social Security Act, from April 19, 2005 through November 1, 2007 (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

12. Medical improvement occurred as of November 2, 2007, the date the clamant's disability ended. (20 C.F.R. § 404.1594(b)(1))

13. Beginning on November 2, 2007, the claimant has not had an impairment or combination of impairments that meets or medically equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P. App. 1 (20 C.F.R. § 404.1594(f)(2)).

14. After careful consideration of the entire record, the undersigned finds that, beginning on November 2, 2007, the claimant has had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except that he could stand and walk in excess of 2 hours a day but less than 6 hours a day; could sit for 6 hours a day; would require a sit/stand option; could occasionally stoop, crouch, crawl, squat, kneel, balance and climb stairs; could never climb ladders and scaffolds; would need to avoid dangerous heights and machinery; would need to avoid vibrations in the workplace; would need to avoid concentrated exposure to extreme cold; would be able to understand, remember and carry out detailed instructions and could concentrate and persist adequately at that level of complexity and could sustain a 40 hour work week, 8 hours a day 5 days a week with difficulty due to symptoms, primarily pain and fatigue, but with effort could do it.

15. The medical improvement that has occurred is related to the ability to work (20 C.F.R. § 404.1594(b)(4)(I)).

16. Since November 2, 2007, the claimant's age category has not changed (20 C.F.R. § 404.1563).

17. Beginning on November 2, 2007, the claimant has been unable to perform past relevant work (20 C.F.R. § 404.1565).

18. Beginning on November 2, 2007, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (20 C.F.R. pt. 404, subpt. P, app. 1).

19. Beginning on November 2, 2007, considering the claimant's age, education, work experience, and residual functional capacity, the claimant has been able to perform a significant number of jobs in the national economy (20 C.F.R. § 404.1560(c) and 404.1566).

20. The claimant's disability ended on November 2, 2007 (20 C.F.R. § 404.1594(f)(8)).

### C. Analysis

Plaintiff argues that the ALJ's determination was not based upon substantial evidence because: (1) there is no substantial evidence to support the ALJ's finding that plaintiff's impairments medically improved such that he was able to perform work as of November 2, 2007; (2) the ALJ made no credibility finding with respect to the testimony of plaintiff's father; and (3) the ALJ erred in concluding that plaintiff's anxiety was a non-severe impairment. (D.I. 8 at 2) The court considers these arguments within the appropriate context of the regulatory framework.

#### 1. ALJ's finding of medical improvement

In conjunction with step three of the closed period analysis, the ALJ found that

15

medical improvement occurred as of November 2, 2007, concluding that

> [t]he medical evidence demonstrates that the claimant began to demonstrate improvement in his pain level in October 2007. In particular, medical records from Dr. Falco show that on October 1, 2007, he claimed he had 4/10 pain with medications in his neck, 4/10 pain with medications in his low back, and 4/10 pain with medication in his tail bone. On October 29, 2007 the claimant had 4-5/10 pain with medicines in the same three areas. The claimant indicated that he essentially remained the same on this examination. While there was an increase in his pain level for several months, by February 2008, Dr. Falco noted that he was back to 5/10 pain in all areas with medication. In March 2008, his pain was rated 4-6/10 with medications in all areas and had decreased to 4-5/10 in all areas by May 2008. There was no significant lasting change in his pain levels through February 2009. Pain levels averaging 4-5/10 are not consistent with disabling pain. In addition, there is little in the way of objective findings to support the claimant's subjective complaints. Despite numerous subjective complaints during his evaluation with Dr. Niaz in November 2007, Dr. Niaz found no sensory, motor or reflex abnormalities on examination. There was no muscle atrophy and no muscle spasm. There was no dystrophy of the muscles, no contractures, no arthritis and no limitations of joint movement other than the right hip and knee due to alleged pain. Thus, despite all his allegations of poor balance, inability to heel/toe walk, pain with movement in his low back and pain with straight leg raising, there were no objective findings on examination to support these complaints. Dr. Niaz even indicated that his findings were subjective. These findings are consistent with medical improvement. Even examinations by Dr. Falco from October 2007 demonstrated normal upper and lower deep tendon reflexes, normal strength, normal muscle tone and normal sensation. Dr. Falco stated that the claimant's gait was coordinated and smooth on October 29, 2007. Once again there is a lack of objective findings to support his subjective complaints. The claimant improved medically.

(*Id.* at 23)

Plaintiff argues that the ALJ failed to demonstrate medical improvement because the record demonstrates that there was no change in plaintiff's medical condition as of November 2, 2007. (D.I 16 at 16-21) Falco examined plaintiff in June 2007, August 2007, and October 2007, all dates within plaintiff's closed window of disability. (D.I. 8 at 11) Falco also examined plaintiff November 2007, December 2007, and January 2008. (*Id.*) During each of these examinations, Falco indicated that plaintiff's condition

16

remained the same. (D.I. 5 at 364, 367, 444, 460, 462, 464) In each of these reports, Falco indicated that plaintiff was alert and oriented, with facial movement and strength symmetrical normal. (*Id.*) He had normal bilateral shoulder shrug strength, as well as normal light touch sensation, finger to nose and heel to shin condonation, hearing, touch sensation, deep tendon reflex, recent and remote memory. (*Id.*) Plaintiff could concentrate well, was not easily distracted, and his speech was smooth and clear. (*Id.*)

The ALJ did not point to any substantial evidence to support her finding of medical improvement. As discussed above, Falco's treatment reports indicate that plaintiff suffered roughly the same pain levels from August 2007 until February 2009. The only notable difference before and after November 2, 2007 is that Falco indicated on November 26, 2007 that "[plaintiff's] pain medications are providing adequate pain control without any side effects." (*Id.* at 461) Yet, the ALJ did not mention reliance on this statement in her opinion. The above block citation represents the full text of the ALJ's medical improvement analysis. Her reliance on Falco's report that plaintiffs pain levels held steady and that his muscles have not atrophied is notably different than other closed period/medical improvement cases wherein doctors reported that the plaintiffs in suit experienced "marked[]" improvements in pain and symptoms post surgery, or that plaintiffs' symptoms were "relieved" by the surgery. *Wleczyk v. Astrue*, Civ. No. 09-118, 2010 WL 3384724, at *4 (M.D. La. July 26, 2010); *Palmer v. Astrue*, 284 Fed. Appx. 873, 877 (3d Cir. 2008) (doctor's letter said that plaintiff's rheumatoid arthritis was in "complete remission"); *Woolfolk v. Commissioner of Social Sec.*, 85 Fed. Appx. 766, 767 (3d Cir. 2004) (doctor noted that plaintiff's "back pain is completely

gone").

The ALJ was required to find medical improvement based on "'changes (improvement) in the symptoms, signs and/or laboratory findings associated with' the impairments." *Fifer v. Astrue*, Civ. No. 08-372, 2008 WL 4922114, at *5 (E.D. Pa. Nov. 10, 2008) (quoting 20 C.F.R. § 404.1594(b)(1)). The ALJ's opinion points to no such change and, therefore, the case is remanded for further review.

### 2. Weight given to plaintiff's father's testimony

Plaintiff's father's testimony was duplicative of plaintiff's own testimony. After briefly hearing from plaintiff's father, the ALJ asked plaintiff's attorney if he had any specific questions for plaintiff's father, which he did not. (D.I. 5 at 51) She then dismissed plaintiff's father and began questioning the VE. (*Id.*)

In her opinion, the ALJ mentioned that plaintiff's father had testified, then moved on to find plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms to not be credible. (*Id.* at 25) The ALJ did not specifically address the credibility of plaintiff's father's statements.

While "an ALJ must expressly consider and address the impact of testimony from lay witnesses," it was harmless error for her to fail to do so, as it would not have changed the outcome of the case. *Butterfield v. Astrue*, Civ. No. 06-603, 2011 WL 1740121, at *6 (E.D. Pa. May 5, 2011) As in *Bailey v. Astrue*, Civ. No. 07-4595, 2009 WL 577455, at *11 (E.D. Pa. Mar. 4, 2009), "plaintiff's [father's] testimony would not have changed the ALJ's decision as it was cumulative and merely reiterated the fact that plaintiff experienced pain which [he] observed when [plaintiff] visited [him]."

18

### 3. AlJ's finding that plaintiff's anxiety is not severe

Plaintiff bore the burden of proving that his anxiety was severe. 20 C.F.R. § 404.1520(c); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). The ALJ noted that plaintiff did not describe any significant mental health problems at the hearing, nor has he ever visited a psychologist. (D.I. 5 at 20) The record also supports the ALJ's findings. During plaintiff's visits to Falco, it was noted that plaintiff concentrated well and was not easily distracted, that his speech was smooth and clear, that his recent and remote memory were intact and that he was aware of current events. (*Id.* at 364, 408, 411-12, 423, 428, 431, 438, 441, 444, 447, 450, 464) There is no indication that plaintiff's anxiety was "severe" within the meaning of the statute.

## V. CONCLUSION

In view of the foregoing, the case is remanded for a determination of plaintiff's medical improvement after his closed period of disability. Plaintiff's motion for summary judgment (D.I. 7), therefore, is granted and defendant's motion for summary judgment (D.I. 9) is denied. An appropriate order shall issue.